JOAN HAYES *v.* THOMAS P. GILL, LIEUTENANT GOVERNOR OF THE STATE OF HAWAII.

No. 5015.

AUGUST 26, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY MARUMOTO, J.

This case is before us on a submission on agreed facts under HRS c. 631, filed on August 10, 1970. The submission is a sequel to respondent's letter of August 5 to petitioner, which is referred to below.

Petitioner is seeking election as a member of the house of representatives of the sixth State legislature, the first regular session of which will convene on January 20, 1971. She is of the age of majority, is a qualified voter of the representative district from which she seeks to be elected, and will complete her three years' residence in the State on January 10, 1971.

Respondent is lieutenant governor of the State, and is also its chief election officer. In the latter capacity, he has the ministerial duty of printing the names of candidates, who file proper nomination papers, on the ballots for primary elections.

The State constitution provides as follows in article III, section 7: "No person shall be eligible to serve as a member of the senate unless he shall have been a resident of the State for not less than three years, have attained the age of majority and be a qualified voter of the senatorial district from which he seeks to be elected. No person shall be eligible to serve as a member of the house of representatives unless he shall have been a resident of the State for not less than three years, have attained the age of majority and be a qualified voter of the representative district from which he seeks to be elected."

HRS § 12-3(6), which is part of S.L.H. 1970, c. 26, proscribes the printing of the name of any candidate on a primary election ballot unless the candidate files a nomination paper containing a certification that he will "qualify under the law for the office he is seeking by the date of the next election, and that he is a registered voter and a resident in the district from which he is running."

In order to become a member of the house of representatives of the sixth State legislature, petitioner must first be nominated at the primary election to be held on October 3, 1970, after filing her nomination paper by August 19, and then be elected at the general election to be held on November 3.

On August 5, petitioner presented her nomination paper to respondent, with proper filing fee. Respondent found the nomination paper to be in order except for the certification required under § 12-3(6). With respect to the certification, instead of certifying that she would qualify under the law for the office she was seeking by November 3, as printed on the form furnished by respondent, petitioner changed the date and certified that she would qualify by January 10, 1971. Respondent took the position that, by changing the date, petitioner failed to comply with § 12-3(6), and wrote to her: "Because of this, I have no choice but to hold your nomination paper and remittance in abeyance pending a decision by an appropriate court."

The first question which we are called upon to decide on this submission is whether § 12-3(6) is valid under the State constitution. If we answer that question in the affirmative, we must then decide whether the residency requirement in article III, section 7, is valid under the United States Constitution.

It is petitioner's contention that § 12-3(6) is invalid because it violates the State constitution in two respects, first, in requiring a candidate to certify to compliance with a residency requirement which differs from the residency requirement in article III, section 7, and, second, in foreclosing the senate, or the house of representatives, of a future legislature from rendering a judgment under article III, section 13, as to whether a candidate elected to it has the qualifications to be its member. Article III, section 13,

provides: "Each house shall be the judge of the elections, returns and qualifications of its own members."

In our opinion, § 12-3(6) does not require a candidate to certify to compliance with a residency requirement which differs from the residency requirement in article III, section 7.

There is a slight ambiguity in § 12-3(6). It requires a candidate to certify that he will qualify by the date of "the next election." Petitioner urges upon us that the quoted words mean the ensuing primary election because the primary election is the next election which is held after the filing of the nomination paper.

From the context of the statute in which the quoted words are used, and considering the apparent purpose for which § 12-3(6) was enacted, we have no doubt that the legislature meant the general election and not the primary election.

Under the rule of construction stated in HRS § 1-15, where the words of a statute are ambiguous, their true meaning may be ascertained by considering the context, as well as the reason and spirit of the statute and the cause which induced the legislature to enact it. The quoted words must be read in the context of S.L.H. 1970, c. 26, which provides the procedure for "all elections, primary, general, special or county." The apparent purpose of § 12-3(6), as we see it, is to prevent the occurrence of a situation where, after a candidate is elected, he is found not to possess the qualifications stated in article III, section 7.

There is also an ambiguity in article III, section 7. The ambiguity consists of an omission to state the date as of which the qualifications stated therein must be met. In such a situation, it is the task of a court to resolve the ambiguity by filling the gap.[1]

---

[1] Some refer to the process as construction. Others frankly acknowledge it as judicial legislation, although done only interstitially. Holmes, J., in Southern Pacific Co. v. Jensen, 244 U.S. 205, 221 (1917): "I recognize without hesitation that judges must and do legislate, but they can do so only interstitially."

In filling the gap here, we think that the proper date to be read into article III, section 7, is the date of the general election.

There was no uncertainty under the Organic Act regarding the date by which a member of the house of representatives should have qualified, for section 40 of the act required that he possess the qualifications "at the time of election."

That the framers of the State constitution intended no change is evident from the report of the Committee on Legislative Powers and Functions of the Constitutional Convention of 1950, which stated: "Section 7 states the qualifications for members of the senate and the house of representatives. The requirements are the same as in the Organic Act * * *." Standing Committee Report No. 92, I Proceedings of the Constitutional Convention of Hawaii 1950, 251.

We see no significance in the failure to include the words "at the time of election" in article III, section 7. In this connection, it may be noted that section 34 of the Organic Act, relating to the qualifications of senators, did not contain those words.

Petitioner argues that the proper date to be read into article III, section 7, is the date of commencement of the first regular session of each legislature.

Under article III, section 11, the legislature convenes annually in regular session at 10:00 o'clock A:M. on the third Wednesday in January. Under article II, section 5, general elections are held on the first Tuesday after the first Monday in November in all even-numbered years. Thus, the first regular session commences slightly more than two months after the date of the general election.

In support of her argument, petitioner relies on the words "eligible to serve," as used in article III, section 7. Her point is that, if she is elected, normally she will not be

required to serve until the convening of the first regular session, and that, by the time the first regular session is convened, she will have completed her three years' residence in the State and will be eligible to serve.

Petitioner's argument ignores the possibility that there may be an emergency which requires the calling of a special session between the date of the general election and the convening of the first regular session and the importance of the availability of all legislators for service in case such special session is convened. It may well be that the emergency which requires the convening of such special session will involve a situation where the need of the constituents to be effectively represented is the greatest.

Article III, section 5, provides: "The term of office of members of the house of representatives shall be two years beginning with their election and ending on the day of the next general election, and the term of office of members of the senate shall be four years beginning with their election and ending on the day of the second general election after their election." We think that implicit in that provision is the requirement that a legislator be available for service at all times during his elected term, in regular sessions as well as in special sessions.

Under our construction discussed above, § 12-3(6) is consistent with article III, section 7. Both look to the date of the general election as the date by which the qualifications must be met.

With regard to petitioner's contention that § 12-3(6) violates the State constitution in abridging the power of each house of the legislature to judge the qualifications of its members, it has cogency if the powers of a legislative body to judge includes the power to construe the language of the constitutional provision pertinent to the question of qualification.

Past actions in Congress under the provisions of the

Federal Constitution corresponding to article III, section 7, and article III, section 13, of the State constitution, show that the United States Senate and the House of Representatives have both acted on the basis that each has such power. But such actions do not establish that each house in fact has such power. The precise question has not been before the United States Supreme Court. However, we think that there is clear indication in *Powell* v. *McCormack*, 395 U.S. 486 (1969), that if the question is presented to it, it will rule that the power of each house to judge the qualifications of its members does not include the power to construe the constitutional provision on qualifications contrary to the construction of the court.

*Powell* v. *McCormack* was a case in which Congressman Adam Clayton Powell, Jr., sought relief from a denial by the United States House of Representatives of a seat therein for causes other than lack of qualifications stated in the Federal Constitution.

The respondents in the case contended that the court was barred from adjudicating Powell's claims, first, because of "textually demonstrable commitment" formulation of the political question doctrine in *Baker* v. *Carr*, 369 U.S. 186, 217 (1962), and, second, because a judicial resolution of his claims will produce a potentially embarrassing confrontation between coordinate branches of the federal government.

The court rejected the contention. As to the first ground, it ruled that article I, section 5, of the Federal Constitution, which empowers each house of Congress to be the judge of the qualifications of its members, "is at most a 'textually demonstrable commitment' to Congress to judge only the qualifications expressly set forth in the Constitution." As to the second ground, it stated: "But, as our interpretation of Art. I, § 5, discloses, a determination of petitioner Powell's right to sit would require no

more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law * * *." 395 U.S. 486, 548.

Thus, under *Powell* v. *McCormack,* the power of each house of Congress to be the judge of the qualifications of its members is not plenary but is limited by the qualifications expressly set forth in the Federal Constitution, and the role of construing the constitutional provision rests with the court.

Here, the issues, as framed by the parties, require us to construe article III, section 7. Once we have construed, we do not think that either house of the legislature has the power to act pursuant to a construction contrary to ours. Inasmuch as the certification requirement in § 12-3(6) accords with our construction of article III, section 7, that statute does not violate the State constitution.

This brings us to the question of the validity of article III, section 7, under the United States Constitution. The attack on article III, section 7, is based on the equal protection of laws clause of the fourteenth amendment to the Federal Constitution.

Until *Kramer* v. *Union Free School District,* 395 U.S. 621 (1969), the equal protection of laws clause was satisfied if there was a rational basis for classification, and the burden was upon the party assailing a classification to prove that there was invidious discrimination, as discussed in *State* v. *Johnston,* 51 Haw. 195, 456 P.2d 805 (1969).

In the State Constitutional Convention of 1968, the three-year residency requirement of article III, section 7, was scrutinized by the delegates. Proposals were made to eliminate or reduce the requirement. The requirement was retained in accordance with the recommendation of the Committee on Legislative Powers and Functions, stating: "The residency requirements, too, are important; all states include such provisions in their constitutions. The role of

the legislator is to represent the views of his constituents, and he must be familiar with them and their needs, which familiarity residency, in some measure, assures." Constitutional Convention of Hawaii 1968, Standing Committee Report No. 46, p. 7.

We cannot say that the action of the constitutional convention in retaining the residency requirement is devoid of rational basis. Certainly the action is not invidiously discriminatory.

Residency requirement for legislators is not unique to this State. Our examination of state laws shows that every state, except Nevada, has residency requirement of varying length. Nor is a three-year requirement unusual. Nine other states have the same requirement. Five states require longer residency. See accompanying table.

In *Kramer* v. *Union Free School District, supra,* the United States Supreme Court struck down, as being in violation of the equal protection of laws clause, a New York law which prohibited residents who were otherwise eligible to vote in state and federal elections from voting in certain school districts unless they owned or leased taxable realty in the district or were parents of children enrolled in the local public schools. In so doing, the court stated the issue in the case was whether the law furthered a "compelling state interest" to justify the denial of franchise. The court observed that the requirements of the law were not sufficiently tailored to limiting the franchise to those "primarily interested" in school affairs, implying that the law might pass muster if it were so limited.

It will be observed that *Kramer* is a voting right case. The case here involves a right to run for office and not a right to vote. That the United States Supreme Court deems that different considerations are involved in a right to vote and a right to run or to hold office is indicated in *Turner* v. *Fouche,* 396 U.S. 346 (1970), where the court

## RESIDENCY REQUIREMENT FOR REPRESENTATIVES

|  | 5-yr. | 4-yr. | 3-yr. | 2-yr. | 1-yr. | 6-mo. | None |
|---|---|---|---|---|---|---|---|
| Alabama |  |  | x |  |  |  |  |
| Alaska |  |  | x |  |  |  |  |
| Arizona |  |  | x |  |  |  |  |
| Arkansas |  |  |  | x |  |  |  |
| California |  |  | x |  |  |  |  |
| Colorado |  |  |  |  | x |  |  |
| Connecticut |  |  |  |  |  | x |  |
| Delaware |  |  | x |  |  |  |  |
| Florida |  |  |  |  | x |  |  |
| Georgia (A) |  |  |  | x |  |  |  |
| Hawaii |  |  | x |  |  |  |  |
| Idaho |  |  |  |  |  | x |  |
| Illinois | x |  |  |  |  |  |  |
| Indiana |  |  |  | x |  |  |  |
| Iowa |  |  |  |  | x |  |  |
| Kansas |  |  |  |  |  | x |  |
| Kentucky |  |  |  | x |  |  |  |
| Louisiana | x |  |  |  |  |  |  |
| Maine |  |  |  |  | x |  |  |
| Maryland |  |  | x |  |  |  |  |
| Massachusetts |  |  |  |  | x |  |  |
| Michigan |  |  |  |  |  | x |  |
| Minnesota |  |  |  |  | x |  |  |
| Mississippi |  | x |  |  |  |  |  |
| Missouri |  |  | x |  |  |  |  |
| Montana |  |  |  |  | x |  |  |
| Nebraska |  |  |  |  | x |  |  |
| Nevada |  |  |  |  |  |  | x |
| New Hampshire |  |  |  | x |  |  |  |
| New Jersey |  |  |  | x |  |  |  |
| New Mexico |  |  |  |  | x |  |  |
| New York | x |  |  |  |  |  |  |
| North Carolina |  |  |  |  | x |  |  |
| North Dakota |  |  |  | x |  |  |  |
| Ohio |  |  |  |  | x |  |  |
| Oklahoma |  |  |  |  |  | x |  |
| Oregon |  |  |  |  | x |  |  |
| Pennsylvania |  | x |  |  |  |  |  |
| Rhode Island |  |  |  | x |  |  |  |
| South Carolina |  |  |  |  | x |  |  |
| South Dakota |  |  |  | x |  |  |  |
| Tennessee (A) |  |  | x |  |  |  |  |
| Texas |  |  |  | x |  |  |  |
| Utah |  |  | x |  |  |  |  |
| Vermont |  |  |  | x |  |  |  |
| Virginia |  |  |  |  | x |  |  |
| Washington |  |  |  |  | x |  |  |
| West Virginia |  |  |  |  | x |  |  |
| Wisconsin |  |  |  |  | x |  |  |
| Wyoming |  |  |  |  | x |  |  |
|  | 3 | 2 | 10 | 11 | 18 | 5 | 1 |

(A) Georgia and Tennessee require citizenship instead of residence.

resolved the issue of discrimination under the pre-*Kramer* test and declined to rule on the applicability of the compelling state interest test. That case involved a statute restricting membership on school boards to freeholders.

In the absence of any decision of the United States Supreme Court applying the compelling state interest test to qualifications for elective office, we apply here the pre-*Kramer* rationality test. This does not imply that we think that article III, section 7, does not pass the *Kramer* test.

*Stapleton* v. *Clerk for the City of Inkster,* 311 F. Supp. 1187 (1970), has been cited as an authority for the application of the compelling state interest test to qualifications to run. Our answer to that is, first, the decision there is by a single judge of a lower federal court; second, the decision is actually based on the rationality test and the discussion of the compelling state interest test is dictum; and, third, one of the qualifications was two-year residency but the constitutional validity of that qualification was never questioned.

In view of the foregoing, the case is dismissed.

*Anthony P. David* and *George K. Noguchi* for petitioner.

*Bertram T. Kanbara,* Attorney General (*Morton King* and *Thomas M. Pico, Jr.,* Deputy Attorneys General, with him on the brief), for respondent.

*Steven E. Kroll* for American Civil Liberties Union, amicus curiae.

### DISSENTING OPINION OF LEVINSON, J.

I dissent for the following two reasons, each of which is sufficient, in my opinion, to grant the petitioner the relief she seeks: (1) HRS § 12-3(6) is repugnant to article III, section 13 of the Hawaii constitution and is therefore unconstitutional; (2) The three-year residency requirement to serve in the Hawaii house of representatives

prescribed by article III, section 7 of the Hawaii constitution violates the equal protection clause of the fourteenth amendment of the United States Constitution and is therefore void.

## I. THE HAWAII CONSTITUTIONAL ISSUE

*The Power of the Legislature to Judge the Qualifications of Its Own Members.*

Article III, section 13 of the Hawaii constitution states: "Each house shall be the judge of the elections, returns and qualifications of its own members...." I believe that HRS § 12-3(6) usurps this power and is, therefore, unconstitutional under the Hawaii constitution.

The majority opinion construes HRS § 12-3(6) as merely clarifying the qualifications set forth in article III, section 7 of the State constitution rather than as adding a new qualification. This may be the purpose of HRS § 12-3(6) but its enactment by the fifth Hawaii legislature does, under the majority opinion, take away from the sixth Hawaii legislature the power to sit in judgment on the "qualifications of its *own members.*" As the briefs of the petitioner and the respondent point out, the necessary date for the fulfillment of the residency requirement set forth in article III, section 7 of the State constitution[1] is open to conflicting interpretations. In the light of the clear language of article III, section 13 I think it is apparent that the State constitution has delegated to the house of representatives the right to make a final determination as to when the residency requirement set forth in article III, section 7 must be met by its members. The

[1] Article III, section 7 states: "No person shall be eligible to serve as a member of the house of representatives unless he shall have been a resident of the State for not less than three years, have attained the age of majority and be a qualified voter of the representative district from which he seeks to be elected."

residency requirement is one of the constitutionally listed qualifications for membership in the house of representatives, and the constitution plainly states that each house shall judge the qualifications of its own members. To sit in judgment necessarily implies the power to interpret the law affecting the case, in this instance, article III, section 7. However, the majority opinion by validating HRS § 12-3(6) clearly deprives the sixth Hawaii legislature of this power of interpretation.

HRS § 12-3(6) requires the chief election officer to refuse to place on the ballot the name of any candidate who will not certify that he will have met the residency requirement "by the date of the next election." This is one interpretation of article III, section 7. However, the fifth Hawaii legislature when enacting HRS § 12-3(6) could have interpreted section 7 as not requiring that the residency qualification be met until the day when the newly elected legislature first convened, or, alternatively until the elected representative presented himself for membership in the house of representatives. The Hawaii constitution does not empower any one session of the legislature to make a final interpretation of the residency requirement binding upon all future legislatures. Each legislature is given the power to decide this issue for itself. HRS § 12-3(6) is unconstitutional because it precludes the petitioner from being a candidate for office and, if elected, having the opportunity to present her arguments as to when the residency requirement must be met before the constitutionally proper forum—the house of representatives of the sixth Hawaii legislature.

The United States Senate has on at least four occasions been confronted with situations where it determined the constitutional qualifications of persons who presented themselves for membership. In the case of Rush D. Holt the Senate was confronted with the question as to when a

member must meet the requirement of article I, section 3 of the United States Constitution that he be thirty years of age. Holt was elected as a senator from West Virginia for a six-year term beginning January 3, 1935. He did not attain the age of 30 years until June 19, 1935. Thereafter he presented himself to the Senate for membership. After extensive debate as to when the Constitution required that a senator satisfy the age requirement the Senate passed the following resolution by a vote of 62 to 17, with 16 not voting:

> *Resolved,* That Rush D. Holt is entitled to his seat in the Senate of the United States as a Senator from the State of West Virginia, it appearing that he was 30 years of age at the time when he presented himself to the Senate to take the oath and to assume the duties of the office. S. Res. 155, 74th Cong., 1st Sess., 79 CONG. REC. 9841 (1935).

During the course of the two-day debate it was never doubted by any of the senators present that it was to the Senate alone that the power to interpret the age requirement belonged. Senator George of Georgia, chairman of the Committee on Privileges and Elections, in presenting the report recommending that Holt be seated reminded the Senate that "it is, of course, well known that each House of the Congress—or, in this instance, the Senate—is the sole judge of the elections, the returns, and the qualifications of its own members." 79 CONG. REC. 9753 (1935).[2]

In early decisions of the United States Senate it decided not to seat Albert Gallatin (the vote being 14 to 12) and James Shields who at the times they presented themselves for membership had not been citizens of the United States

---

[2] The pertinent portions of article I, section 5 of the United States Constitution and article III, section 13 of the Hawaii constitution are identical in wording.

for the period of time required by the Constitution. In Rush Holt's case he attained the requisite age of 30 years after the commencement of the term for which he was elected and before he presented himself. In the circumstances there is no inconsistency between the Gallatin-Shields cases and the Holt case. Even if there were an inconsistency, certainly the Holt case overruled the earlier cases and demonstrates conclusively that one session of the Senate cannot bind a later session in these matters.

The Holt, Gallatin and Shields cases support my interpretation of the Hawaii constitution that each house of the legislature is the sole judge in determining when the residency qualification of its own members must be met. *Powell* v. *McCormack,* 395 U.S. 486 (1969) does not in any way alter this conclusion.

The *Powell* case involved an effort by the House of Representatives *to add* qualifications to the three standing qualifications laid down in article I, section 2 of the United States Constitution.[3] The House excluded Powell not because he failed to meet any of the age, citizenship or inhabitancy qualifications but because he had in the past allegedly made false reports on his expenditures to the House. The Supreme Court struck down this action by the House not because the House of Representatives has no power to render a constitutional interpretation as to the three standing requirements set forth in article I, section 2 of the Constitution, but because the House had clearly exceeded its authority and excluded Powell on grounds which found no constitutional sanction. As Mr. Chief Justice Warren stated, speaking for the majority: "Further, analysis of the 'textual commitment' under Art. I, § 5 ... has demonstrated that in judging the qualifica-

---

[3] Those qualifications are: "No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not. when elected, be an Inhabitant of that State in which he shall be chosen."

tions of its members Congress is limited to the standing qualifications prescribed in the Constitution." *Powell v. McCormack, supra* at 550.[4] I believe this statement is an affirmation of the power of the legislature to judge the qualifications of its own members and that the *Powell* case really stands for the proposition that such a judgment by the legislature is subject to judicial review only when the basis for the legislative judgment goes beyond the power granted to the legislature by the Constitution. Even if the *Powell* case could be interpreted as holding that the Court has power to review the determination of the House relating to the standing constitutional qualifications, such review would not take place until after the proper session of the House passes on the disputed qualifications of its own members.

If there is any ambiguity in this constitutional provision, I feel constrained to resolve such ambiguity in a manner which least impinges upon the petitioner's constitutionally protected right to be a candidate for elective office and which provides the greatest scope to the voters in selecting their representatives. Therefore, I would hold that in the instant case the fifth State legislature has exceeded its constitutional authority in attempting to pass judgment on the qualifications of the members of future legislatures, a power expressly denied it by article III, section 13 of the State constitution. HRS § 12-3(6) violates the Hawaii constitution.

---

[4] It is also enlightening that the Court, in discussing instances when the Congress had excluded men who presented themselves for membership concentrated only on those cases where exclusion had been based on grounds other than the three standing requirements of the Constitution. At no point did the Court mention or question the propriety of the Gallatin, Shields or Holt cases.

## II. THE FEDERAL CONSTITUTIONAL ISSUE

### A. *The Compelling State Interest Test.*

This case involves the right to be considered for public service, a right which is fundamental to the concept of democracy and which has been afforded constitutional protection. *Turner* v. *Fouche,* 396 U.S. 346, 362-63 (1970). The right to run for elective office and right to vote for candidates running for such office uphold a fundamental principle of our representative democracy which is, in Alexander Hamilton's words, quoted by Mr. Chief Justice Warren, "that the people should choose whom they please to govern them." *Powell* v. *McCormack,* 395 U.S. 486, 547 (1969).[5] As Madison pointed out at the Constitutional Convention, "this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself." *Powell* v. *McCormack, supra* at 547.

The respondent acknowledges the fundamental nature of the right to run for elective office and that such right enjoys constitutional protection equal in scope to that afforded the exercise of the right to vote. Furthermore, the respondent contends that the power given the states to impose restrictions upon the right of suffrage, *Carrington* v. *Rash,* 380 U.S. 89, 91 (1965), is co-extensive with the power of the states to regulate the right to run for office. I do not quarrel with this contention. However, I do take issue with the majority opinion which holds that when the implementation of this power takes the form of a durational residency requirement for running for elective office and such implementation is challenged as a denial of equal protection of the laws as guaranteed by the fourteenth amendment to the Federal Constitution, the state is only

---

[5] Article I, section 1 of the Hawaii constitution affirms this principle, stating: "All political power of this State is inherent in the people; and the responsibility for the exercise thereof rests with the people. All government is founded on this authority."

required to meet the traditional test of rational relationship to a legitimate state purpose in justifying its residency requirement. A careful scrutiny of recent Supreme Court decisions in the area of voting rights leads me to conclude that the Supreme Court has departed from the permissive traditional yardstick[6] and has adopted a stricter standard which requires the state to demonstrate a compelling state interest in order to sustain its restrictive classification in the area of the exercise of the franchise. *City of Phoenix* v. *Kolodziejski,* 399 U.S. 204 (1970); *Evans* v. *Cornman,* 398 U.S. 419 (1970); *Cipriano* v. *City of Houma,* 395 U.S. 701 (1969); *Kramer* v. *Union Free School District,* 395 U.S. 621 (1969); *Williams* v. *Rhodes,* 393 U.S. 23 (1968). Because the right to run for elective office cannot be said to be less fundamental than the right to vote, I believe this stricter standard must be applied in this case.

In the area of voting rights the Supreme Court departed from the traditional standard when judging legislative classification in the apportionment case, *Reynolds* v. *Sims,* 377 U.S. 533 (1964). The Court held that the equal protection clause demanded that a statutory restriction on the exercise of the franchise receive special examination.

> Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. 377 U.S. at 562.

The Court extended the use of this stricter test to a non-apportionment voting rights case in *Harper* v. *Virginia Board of Elections,* 383 U.S. 663 (1966), invalidat-

---

[6] For an illustration of the application of the traditional standard see McGowan v. Maryland, 366 U.S. 420, 425 (1961).

ing a poll tax requirement in an election of state representatives. The Court in applying the stricter test stated:

> We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined. 383 U.S. at 670.[7]

In *Kramer* v. *Union Free School District*, 395 U.S. 621, 627 (1969), the Court again held that where a right as fundamental as the right to vote is at issue the state is required to do more than merely show a rational basis for a restrictive classification. The *Kramer* case struck down a New York property ownership requirement as a condition for voting in a local school board election.[8] The Court reasoned:

> This careful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. *Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government.* 395 U.S. at 626 (emphasis added).

This rationale would, of course, apply with equal force to state restrictions on the right to run for elective office, for the right to vote and the right to run for public office are equal in their fundamental importance, as the respondent acknowledges. Indeed, the United States Supreme Court has stated that a restriction upon the voter's choice of candidates is as much of an infringement upon his rights as a restriction upon the franchise itself. *Powell* v. *McCor-*

---

[7] See dissent of Harlan, J., 383 U.S. 680, for a discussion of the differences between the traditional test and the stricter standard expounded in *Harper*.

[8] See also, Cipriano v. City of Houma, 395 U.S. 701 (1969) and City of Phoenix v. Kolodziejski, 399 U.S. 204 (1970).

*mack,* 395 U.S. 486, 547 (1969); see also *Williams* v. *Rhodes,* 393 U.S. 23, 31 (1968).

A recent Michigan federal district court decision, *Stapleton* v. *Clerk for City of Inkster,* 311 F. Supp. 1187, 1189 (E.D. Mich. 1970), after an examination and analysis of the *Kramer* case and some of the other authorities cited above, expresses the same conclusion I have reached that in testing state qualifications on the right to run for public office the state must demonstrate a compelling state interest in order to justify the qualification.[9]

Finally, any doubts that the compelling state interest test must be applied in determining the validity of residence requirements as well as property[10] and monetary restrictions[11] should be laid to rest by *Evans* v. *Cornman,* 398 U.S. 419 (1970). In *Evans,* the Court struck down the decision of a Maryland County Registry Board that persons living on a federal enclave located within the geographical boundaries of Maryland were not to be considered Maryland residents for voting purposes. In commenting on the test to be used in judging the rationale put forward by the state for this restriction the Court said:

> The sole interest or purpose asserted by appellants to justify the limitation on the vote in the present case is essentially to insure that only those citizens who are primarily or substantially interested in or affected by electoral decisions have a voice in making them. Without deciding the question, *we have assumed that such an interest could be sufficiently compelling* to justify limitations on the suffrage, at least with regard to some

---

[9] In *Stapleton* the city required as a qualification for the office of city councilman that the officeholder be an owner of real property for a period of two years prior to the last day for filing the nominating petitions for such office.

[10] Kramer v. Union Free School District, 395 U.S. 621 (1969).

[11] Harper v. Virginia Board of Elections, 383 U.S. 663 (1966).

elections. . . . However, it is clear that such a claim cannot lightly be accepted. 398 U.S. at 422 (emphasis added).[12]

A three-judge district court in Massachusetts has within the last two months filed a decision, citing *Evans*, which strikes down a Massachusetts durational residency requirement, placed on the right to vote, as failing to promote any compelling state interest. *Burg* v. *Canniffe*, 315 F. Supp. 380 (Mass. 1970).

On the basis of the authorities discussed above I believe that this court has no alternative except to use the compelling state interest test in determining the validity of the Hawaii three-year residency requirement under the equal protection clause of the fourteenth amendment to the United States Constitution.

## B. *The Lack of a Compelling State Interest.*

The sole state interest put forth by the respondent and the majority opinion in support of the three-year residency requirement is the desire to ensure that a legislator representing the people is "familiar with them and their needs." To achieve this result the Hawaii state constitution creates an unrebuttable presumption that all persons residing in this state for less than three years are wanting in sufficient familiarity with local issues to represent their constituents properly. The state has made no attempt to demonstrate that there are not means available to achieve its ends more "finely tailored" than a three-year residency restriction. *Turner* v. *Fouche*, 396 U.S. 346, 364 (1970).

---

[12] In support of their use of the reasonableness test the majority relies upon Carrington v. Rash, 380 U.S. 89 (1965). In that case and in *Evans* persons were deemed by the state not to be residents for voting purposes because of their federal ties. In my opinion the *Evans* decision overrules the use of mere reasonableness test found in *Carrington.*

In fact, the three-year state residency requirement does not on its face appear to be a particularly effective means of assuring that a legislator will be familiar with the local needs and issues of the particular district he represents. For although a candidate must reside somewhere in the state of Hawaii for a period of three years prior to his being eligible to serve as a member of the House, he is only required to reside for a period of three months in the district from which he seeks to be elected.[13] Thus, a person could live for a period of two years and nine months on the island of Niihau and then move to Honolulu and be free to run as a representative to the House from a Honolulu district after being in Honolulu for only three months prior to the election. Such a person may or may not be familiar with local problems after having lived in Honolulu for three months, but I do not think it can be said that the additional two years and nine months or even a lifetime spent on Niihau would assure such familiarity.

Indeed, it would seem that the electoral process itself provides a more finely tuned method for filtering out unqualified candidates. It is, after all, a competitive process and thus the state may be assured that the qualifications of the various candidates will be forcefully presented to the people, who may then exercise their franchise in order to reject those who they feel will not effectively represent their interests. I am not impressed by the schedule appearing in the majority opinion showing residency requirements for representatives in the various states. A similar schedule could have been prepared at the time of *Baker* v. *Carr*, 369 U.S. 186 (1962), showing the extent of malapportionment in the various state legislatures. It merely indicates the extent to which the Constitution is being violated.

---

13 Article III, section 7 Hawaii Constitution; HRS §§ 11-4, 11-8.

Based on the record before us I believe that the state has failed to demonstrate that the three-year durational residency requirement serves a compelling state interest and therefore I would hold that it is in violation of the fourteenth amendment to the United States Constitution. I would allow the petitioner to be a candidate for the office she seeks and let the people decide whether they want her to represent them.